CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

OCT - 7 2008

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

**TIMOTHY L. WILSON**　　　　　)
　　　Plaintiff,　　　　　　　　)　　Civil Action No. 2:07cv00068
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　**MEMORANDUM OPINION**
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
**MICHAEL J. ASTRUE,**　　　　　)
**Commissioner of Social Security,**　)　　By: GLEN M. WILLIAMS
　　　Defendant.　　　　　　　　)　　SENIOR UNITED STATES DISTRICT JUDGE


In this social security case, I affirm the final decision of the Commissioner denying benefits

## I. Background and Standard of Review

The plaintiff, Timothy Wilson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Wilson's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

1

be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wilson filed his application for DIB on April 21, 2005, alleging disability as of April 1, 2004, due to lower back pain and numbness in his feet and legs. (Record, ("R."), at 16, 68-70, 99.) The claim was denied initially and upon reconsideration. (R. at 36-38, 42-50.) Wilson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 51-53.) A hearing was held before the ALJ on October 25, 2006, at which Wilson was represented by counsel. (R. at 324-355.)

By decision dated November 14, 2006, the ALJ denied Wilson's claim. (R. at 13-24.) The ALJ found that Wilson met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 18.) The ALJ determined that Wilson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ also found that Wilson suffered from degenerative lumbar disc disease with disc bulging and stenosis, with low back and bilateral lower extremity pain, chronic bursitis of the right shoulder with a history of a right rotator cuff tear, obesity, and anxiety. (R. at 18.) The ALJ found that these impairments were "severe" based upon the requirements listed in 20 C.F.R. § 404.1520(c). (R. at 18.) However, the ALJ determined that Wilson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ also found that Wilson possessed the residual

2

functional capacity to perform a limited range of light work[1] that allowed the claimant to lift or carry items weighing up to 10 pounds frequently and items up to 20 pounds occasionally, but prohibited overhead lifting with the right arm. (R. at 21). The ALJ found that the claimant was able to sit, stand or walk about six hours each in a typical eight hour workday, with no environmental, communicative or visual limitations. In addition, the ALJ found that the claimant could occasionally kneel, bend, stoop, crouch and crawl, but that he could never climb. (R. at 21.) Due to a moderate reduction in concentration, the ALJ found that the claimant was limited to simple, non-complex tasks. (R. at 21.) Thus, the ALJ determined that Wilson was unable to perform any of his past relevant work as a truck driver. (R. at 22.) Based upon Wilson's age, education, past work experience and the testimony of a vocational expert, the ALJ concluded that Wilson could perform jobs existing in significant numbers in the regional and national economies, including those of a parking lot attendant, airline security guard and ticket taker. (R. at 23.) Therefore, the ALJ found that Wilson was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at. 24.) *See* 20 C.F.R. § 404.1520(g).

After the ALJ issued his decision, Wilson pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 11.) The Appeals Council denied Wilson's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-8.) *See* 20 C.F.R. § 404.981 (2006). Thereafter, Wilson filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Wilson's motion

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b).

3

for summary judgment, filed August 12, 2008, and on the Commissioner's motion for summary judgment, filed September 10, 2008.

## II. Facts

Wilson was born in 1961, which classified him as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 68.) According to the record, Wilson has a high school education and past relevant work experience as a truck driver. (R. at 100, 330.) Wilson's alleged condition resulted from an injury he suffered after he reportedly slipped in the snow while at work, and abruptly twisted his lower back on December 20, 2003. (R. at 253.)

At Wilson's hearing before the ALJ on October 25, 2006, he testified that he was able to read "a little", but indicated that he could not "write good." (R. at 330.) He explained that his lack of writing ability stemmed from the fact that he needed glasses at a young age. (R. at 331.) Wilson noted that his high school grades consisted of "C's and D's." (R. at 331.) Wilson testified that he and his family currently have no health care insurance. (R. at 331) Wilson also testified that he was receiving Workers' Compensation income, and that his back problems are currently being taken care of by Workers' Compensation. (R. at 332.) When asked whether the Workers' Compensation Vocational people have tried to help him get a job, Wilson stated that met with a nurse practitioner, who in turn got him in to see a neurosurgeon, Dr. Ragland. (R. at 332.) Wilson testified that Dr. Ragland stated that he would only be able to help with Wilson's numbness in his back and feet, but not with his back pain, and that he would not recommend surgery. (R. at 333.)

4

Wilson testified that he completed six months of physical therapy as a result of his back injury. (R. at 334.) He stated that the physical therapy did not improve his condition. (R. at 334.) In addition, he had two spinal injections which Wilson claimed made his condition worse. (R. at 334.) He testified that, at the time of the hearing, he took over-the-counter medication for the pain. (R. at 334.) Wilson also testified that he experienced numbness in his feet. (R. at 345.) Wilson stated that upon walking, he felt a burning sensation in his feet that worsened with extended walking. (R. at 345.) Wilson stated that, due to his back pain, he was forced to lie down to obtain any relief of the symptoms. (R. at 345.) He noted that he must lie down a couple of times per day for about 30 minutes at a time. (R. at 346.) In addition, Wilson noted that he also obtained relief by elevating and crossing his legs. (R. at 345.) He further stated that he did not take prescription medication because he was worried he would get "hooked" or "addicted" to such medication. (R. at 334, 346.)

Wilson stated that, at the time of the hearing, he saw his family doctor about once every six months, and that he was prescribed medication for diabetes and blood pressure. (R. at 335) Wilson stated that he had magnetic resonance imaging, ("MRI"), on his back in August 2004 and a computerized axial tomography, ("CAT"), scan in April 2006. (R. at 335.) He stated that neither the CAT scan nor the MRI showed any improvements in his back since the injury. (R. at 335.) Wilson next contended that his back problems worsened after he slipped and fell in some snow. He also noted that his condition worsened when he hit a bump while driving his truck and the seat "bottomed out" on him. (R. 336.) He testified that he subsequently tried to go back to work, but he was told that there

5

were no jobs there that he could perform. (R. 337.) Wilson stated that this was two and one half years ago, noting his back condition had gotten worse. (R. 337.)

When asked about his daily activities, Wilson testified that he does not do "a whole lot." (R. at 338.) Wilson stated that he occasionally moved his yard on his riding lawnmower, and he stated he did not read or cook. (R. at 338.) Wilson testified that his wife's mother and father operated a store in the front of his house and that he often walked to the store and proceeds to stand, sit, and talk when he is there. (R. at 339.) He explained that he did not assist with the operation of the store in any way. (R. at 339.) When asked if he could work as a cashier at the store, Wilson stated that he had never learned to operate a cash register. (R. at 339). Wilson stated that he had not sought any employment other than a truck driver. (R. at 340.) He claimed that his reason for not seeking employment was because if he were to take other employment, his workers' compensation benefits would be affected. (R. at 340.)

When asked about his shoulder injury or condition, Wilson stated that he tore his rotator cuff years ago and that he had trouble lifting his arm above his head at times. (R. at 341.) He stated that, although his shoulder problems had not impacted his truck driving, it had negatively impacted his operation of a bulldozer. (R. at 342.) He claimed that he wanted to learn to drive a bulldozer because it paid a higher wage; it earns two dollars more per hour, however, due to his shoulder pain, he testified that he was physically unable. (R. at 342.) When asked about his depression, Wilson stated that he had received treatment from Dr. Spangler. (R. 342.) However, Wilson stated that he was not taking any anxiety medication. (R. 343.) When asked if he had performed any lighter work in the past, Wilson stated

6

that he worked at a gas station after graduating from high school.

Bonnie Martindale, a vocational expert, also testified at Wilson's hearing. (R. at 346.) Martindale identified Wilson's past relevant work as a truck driver as medium[2], semi-skilled work. (R. at 347.) Martindale stated that Wilson would have transferable skills to light or sedentary[3] occupations, but only to other types of driving occupations, such as an escort driver. (R. at 347.) Martindale stated that an escort driver is one who escorts large modular homes down the highway, and the position is classified as "light" work. (R. at 348.)

The ALJ then asked Martindale to consider a hypothetical claimant of the same age, education and past work experience as Wilson. (R. at 349.) In addition, the ALJ asked Martindale to assume that the claimant was restricted to light work which allowed frequent position changes, and that the claimant could occasionally stoop, kneel, crouch or crawl, but never climb. (R. at 349.) However, the hypothetical claimant had no ability to do overhead lifting with his right arm. (R. at 349.) Based upon this hypothetical, the ALJ asked Martindale to identify any jobs that such an individual could perform. (R. at 349.) Martindale opined that there were jobs, both regionally and nationally, that a person with those restrictions could perform, such as a parking lot attendant, an airline security guard and a ticket taker. (R. at 349-50.)

---

[2] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c) (2006).

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2008).

The ALJ next asked Martindale to incorporate Wilson's mental assessments into this hypothetical, and whether that would change the jobs available. (R. at 351.) Martindale stated that each of Wilson's mental evaluations, which included indications of poor reliability, work absences of two or more days per month and fatigue could affect any of the jobs listed. (R. at 351.)

Wilson's counsel asked Martindale if, taking Wilson's testimony that he obtained relief by raising and crossing his legs as credible, whether there are still jobs he could perform. (R. at 352.) Martindale opined that raising his legs six or eight inches would not affect any of the named jobs, however, if he had to elevate them any higher than this, then there would be no jobs Wilson could perform. (R. at 353.) However, she opined that if he were to elevate his legs during the generally allotted 15 minute breaks in the morning and afternoon, as well as the 30 minutes to an hour allotted for lunch, then that type of schedule would be acceptable for any of these jobs. (R. at 353.)

In rendering his decision, the ALJ reviewed records from Claiborne County Hospital & Nursing Home, ("Claiborne County Hospital"); Dr. Wayne L. McLemore, M.D.; Knoxville Radiological Group Associated; Associated Therapeutics, Inc.; Five Rivers Orthopaedic Associated; Diagnostic Center of Knoxville; Neurosurgery & Spine Consultants of East Tennessee, P.C.; Appalachian Psychological Consultants; Andrew E. Smith, MS, PT; Dr. Jai Varandani, M.D.; Dr. Joel B. Ragland, M.D.; Dr. Glenn E. Jung, M.D.; Dr. Thomas Phillips, M.D., a state agency physician; Heartland Medical, P.C.; and Robert. S. Spangler, Ed.D. Wilson's attorney also submitted a progress note from

8

Dr. Ragland dated September 21, 2006 to the Appeals Council.[4]

Wilson attended physical therapy sessions at Claiborne County Hospital from April 2004 to August 2004. (R. at 160-235.) At Wilson's first visit on April 1, 2004, he complained of recurrent lower back pain, (R. at 226), stemming from an injury he suffered after he reportedly slipped in the snow while at work, and abruptly twisted his lower back on December 20, 2003. (R. at 253.) At his next visit on April 5, 2004, Wilson's physical therapist noted that his lower back pain originated in the lumbar spine area. (R. at 225.) Wilson noted that he was also experiencing foot numbness while driving his truck, as well as numbness in his thighs and calves. (R. at 225.) As part of his physical therapy, Wilson was to use hot and cold applications, undergo electrical stimulation, as well as perform therapeutic exercises such as stretching and flexion programs. (R. at 224.) Wilson had an MRI scheduled for April 15, 2004. (R. at 223.) As a result of the MRI, Dr. Wayne L. McLemore, M.D., diagnosed Wilson with lumbar radiculopathy on April 19, 2004. (R. at 223.)

On April 21, 2004, Wilson reported that the pain in his lumbar spine was now only intermittent; however, the numbness in his lower extremities was still present. (R. at 220.) On April 26, 2004, Wilson stated that he occasionally experienced sharp pains down his lower back when he moved certain ways. (R. at 217) Wilson stated that he had no pain, soreness, or stiffness prior to his treatment, (R. at 217), but reported that the numbness in his feet was constant. (R. at 217.)

---

[4] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

On April 30, 2004, Wilson noted that the numbness had improved and that he was able to mow his yard without any significant increase in lower back pain. (R. at 215.) At his May 5, 2004, visit, Wilson denied symptoms of pain, soreness or stiffness, but stated that he continued to experience some numbness on the lateral side his left foot, which seemed to be improving. (R. at 214.) Wilson also reported a pulling sensation in his lower hamstrings when standing for extended periods of time. (R. at 214.) The physical therapist noted that Wilson tolerated his treatment well, and that no modalities were performed because there appeared to be no pain or soreness. (R. at 214.)

On May 10, 2004, Wilson's physical therapist provided a status report after eight visits, which noted that his pain had decreased to 0/10, and his numbness had improved in the lateral foot although some pain continued. (R. at 213.) The report also noted that Wilson's achilles reflex had improved slightly, however, his patellar reflex has decreased. (R. at 213.) The report noted that Wilson had four more visits to make and that he would like to continue lumbar stabilization. (R. at 213.) On May 12, 2004, Wilson reported "minimal discomfort" after having to change a flat tire. (R. at 208.) On May 18, 2004, Wilson stated that he had been taking Ibuprofen all weekend and that he experienced recent pain on the right side of his back when he twisted to get out of his vehicle. (R. at 206.) On May 19, 2004, Wilson complained that he felt like his right pelvis was out of place and that he was still having a dull ache in the right side of his back. (R. at 205.) Wilson's physical therapist added deep friction messages to his therapy regimen. (R. at 205.)

On May 21, 2004, Wilson reported that he felt much better after his last

10

treatment and that he did not have any pain for the rest of the day. (R. at 204.) On May 25, 2004, Wilson simply stated that he was "doing much better." (R. at 203.) On May 27, 2004, Wilson reported that he had been experiencing a nagging type of pain in the right lumbar area over the past week. (R. at 202.) However, this pain was diminished after his deep tissue massage. (R. at 202.)

On May 28, 2004, Wilson's therapist submitted another status report, in which it was noted that he had developed a dull aching pain in the right lumbar area as a result of twisting to get out of his truck, but that such pain diminished with medication and that it was more of an annoyance that anything. (R. at 201.) The therapist noted that, overall, Wilson had made great progress, with no complaints of radiating pain into either lower extremity. (R. at 201.) However, he did report some continued mild numbness in his left foot, but stated that it was a great deal better than it was previously. (R. at 201.)

On June 7, 2004, Wilson reported occasional pain in his back, but stated that it felt "okay." (R. at 196.) The physical therapist noted that he had some difficulty doing standing exercises due to knee pain, but that he had no back pain. (R. at 196.) On June 9, 2004, Wilson noted that he occasionally had a sharp pain in his hips, but only when making quick movements. (R. at 195.) On June 11, 2004, Wilson's therapist noted in a status report that he was experiencing 3-4/10 pain in his lumbar spine, as well as numbness in his lower left extremity. (R. at 193.) The report also noted that Wilson's strength had improved in his lower left extremity, but his treatment had been somewhat limited due to knee pain during the standing exercises. (R. at 193.)

11

On June 22, 2004, Wilson noted that he was experiencing pain in both legs down to the calf, knees and thighs. (R. at 188.) In a status report dated June 25, 2004, Wilson's therapist noted that he had no change in sensation of numbness in his lower left extremity. (R. at 185.) Wilson also represented that he had pain in his hips and thighs on occasion, and that he had made minimal progress over the past week due to the flu. (R. at 185.) On June 30, 2004, Wilson stated to his physical therapist that he continued to experience back pain in the same location, and that he was scheduled for a functional capacity evaluation, ("FCE".) (R. at 184.) On July 1, 2004, Wilson's physical therapist stated that he needed further stabilization and should discontinue pelvic traction due to a possible hernia. (R. at 183.) On July 6, 2004, Wilson reported no change in his back condition, but reported numbness in his lower left extremity and numbness in right foot. (R. at 181.) On July 7, 2004, Wilson reported no changes to his condition. (R. at 181.) On July 9, 2004, Wilson noted his concern about his ability to return to work. (R. at 179.) On July 12, 2004, Wilson reported increased back pain, as well as pain in the left hip to the buttock. (R. at 178.) The therapist advised Wilson to sleep on his side with a pillow between his knees. (R. at 178.) The therapist noted no sign of radicular symptoms during this visit. (R. at 178.)

On July 14, 2004, Andrew E. Smith, M.S., P.T., administered an FCE to objectively document Wilson's present functional capacities and capabilities and to determine his functional abilities to perform the essential duties and meet the physical demands required of his job as a Caterpillar Dump Truck Driver for Sigmon Coal. (R. at 151.) Upon completion of the evaluation, Smith concluded that Wilson's demonstrated abilities met the specific job demands in many categories, including High Lift, Mid Lift, Low Lift, Full Lift, Walk, Carry-25Lb,

12

Push Cart – 70Lb, Stoop, Crouch, Climb Stairs, Sitting and Standing. (R. at 151.) Smith noted that despite Wilson's subjective pain complaints, he exhibited no functional limitations. (R. at 152.) Smith noted that the results indicated that Wilson's present Physical Demand Characteristic level of work was medium. (R. at 151.) Smith also noted that Wilson experienced numbness in his left thigh and left foot. (R. at 151.) Smith recommended that Wilson request to have the seat in his truck evaluated to insure that it was providing the maximum shock absorption, and if not, then to have the seat repaired or replaced. (R. at 152.)

On July 15, 2004, Wilson reported increased pain on a 5/10 scale, following his FCE. (R. at 177.) Wilson reported continued numbness in lower left extremity as well as in right foot. (R. at 177.) In a status report dated July 16, 2004, Wilson's physical therapist noted that he was experiencing 5/10 lower back pain and right hip pain, with occasional right lower extremity symptoms, such as numbness. (R. at 174.) The therapist noted that, overall, Wilson's strength had remained consistent in his lower back, and that he had improved his endurance, but was still limited. (R. at 174.) His trunk stability was noted as still being weak, especially when fatigued. (R. at 174.) It was noted that Wilson needed further assessments due to signs of nerve root involvement in his condition. (R. at 174.)

On July 22, 2004, he stated that he had injections on the previous day and that his legs did not hurt. (R. at 173.) However, Wilson reported that he had returned to work, but that his boss has sent him home because they did not have any medium work for him to perform. (R. at 173.) The therapist noted that Wilson was energized to get a second opinion and another MRI. (R. at 173.) On July 23, 2004, Wilson complained of a minimal ache that morning while mowing. (R. at

13

172.) After his exercises, the therapist noted that Wilson was moderately fatigued and his muscles remained weak. (R. at 172.) On July 27, 2004, Wilson reported less shooting pain in his extremities and an increased ability to move his feet. (R. at 170.) On July 30, 2007, Wilson could not complete his physical therapy due to increased back pain. (R. at 170.) On August 4, 2004, Wilson reported pain in his lower left extremity and on his right side. (R. at 168.) He reported occasional pain during his treatment, but not constant pain. (R. at 168.) During this session, the therapist noted that Wilson tolerated the exercises well, but needed occasional rest breaks due to fatigue. (R. at 168.) He exhibited no radicular symptoms. (R. at 168.)

On August 9, 2004, Wilson reported that he was pain free and tolerated his treatment well. (R. at 166.) On August 10, 2004, Wilson's therapist reported that he tolerated the treadmill with moderate fatigue. (R. at 164.) In a status report dated August 16, 2004, Wilson's therapist stated that he had made minimal progress since his last visit to the doctor, and that he still had weakness in left quadriceps and numbness in his lower extremities. (R. at 163.) His therapist noted that Wilson's overall endurance had improved; however, he still had signs of nerve root compression. (R. at 163.)

On August 23, 2004, Wilson visited the therapist for the final treatment and to be subsequently discharged. (R. at 162.) The therapist noted that Wilson did not report any tenderness, however, he still had problems standing and sitting. (R. at 162.) The therapist again noted that he had made minimal progress since his last visit. (R. at 162.) On August 25, 2004, Wilson received back care education, where he was shown videos and answered questions relating to back problems. (R.

14

at 161.) Wilson also discussed ergonomics related to job tasks, in addition to the effects of poor posture, improper body mechanics, diet, stress and improper lifting. (R. at 161.)

Throughout his physical therapy treatment at Claiborne County Hospital, Wilson made several visits to Dr. McLemore. On January 5, 2004, Wilson first presented to Dr. McLemore, an orthopedist, for evaluation of his lower back pain. (R. at 253.) Wilson reported that, on December 20, 2003, he slipped in the snow at work injuring his lower back. (R. at 253.) Wilson reported that he felt immediate numbness in the side of his right thigh and lateral in the lower leg. (R. at 253.) Wilson stated that his pain and symptoms had improved about 60 percent since the date of the injury. (R. at 253.) Upon physical examination, Dr. McLemore found no localized weakness in the lower extremities and ankle jerk reflexes were not illicited in the right or left. (R. at 253.) Dr. McLemore found that Wilson had a full range of motion and there was no evidence of significant arthritis, gross deformity, instability, or other obvious injury or abnormality. (R. at 254.) Upon review of x-rays of Wilson's lumbar spine, Dr. McLemore found no degenerative disease. (R. at 254.) Wilson was diagnosed with lumbosacral strain with discogenic lower back pain and lumbar radiculitis. (R. at 254.) Dr. McLemore ordered Wilson to return to his regular job and requested a follow-up in one month. (R. at 254.)

On February 2, 2004, Wilson visited Dr. McLemore stating that that it felt like bones were rubbing together in his lower back and that he still had numbness in his right leg. (R. at 252.) On February 9, 2004, Wilson stated that his back was better, but explained that it still felt like there was something pulling in his back.

15

(R. at 251.) He also reported tightness in his hamstrings. (R. at 251.) Wilson had been off work since the last visit, but was to return to work the next day. (R. at 251.) On March 1, 2004, Wilson told Dr. McLemore that had had been doing much better since he started walking again, but that he still experienced a burning feeling in his back at times. (R. at 250.) Dr. McLemore made no new physical findings, and noted that there was no evidence of long term permanent physical impairment. (R. at 250.)

On April 19, 2004, Wilson reported that he had numbness in his left foot and shooting pains in his left leg. (R. at 249.) At the time of his visit, Wilson had been off work since April 1, 2004. (R. at 249.) Dr. McLemore made no new physical findings and diagnosed Wilson with lumbar radiculitis. (R. at 249.) On April 27, 2004, Wilson reported tingling and numbness in his left foot. (R. at 248.) Dr. McLemore noted that Wilson was unable to return to work at his regular job and would have to work without lifting or frequent stopping or bending, and that the bouncing that accompanied his truck driving, disturbed his back. (R. at 248.) Dr. McLemore suggested that Wilson undergo an epidural steroid injection, ("ESI"), in two weeks if his condition was unimproved. (R. at 248.) On May 11, 2004, Wilson showed dramatic improvement after his physical therapy sessions. (R. at 247.) He reported decreases in numbness and radiating pain and, as a result, Dr. McLemore did not administer the ESI that day. (R. at 247.)

On June 14, 2004, Wilson received his first ESI. (R. at 245.) Dr. McLemore noted that Wilson tolerated the injection well and instructed him to be sedentary for 24 hours. (R. at 245.) Dr. McLemore noted that Wilson was unable to work at his current job unless lighter duties were available. (R. at 245.) On

Case 2:07-cv-00068-GMW-PMS   Document 14   Filed 10/07/08   Page 16 of 38   Pageid#: 86

June 28, 2004, Wilson returned to Dr. McLemore for his second ESI, however, the procedure was delayed due to Wilson's upper respiratory infection and gastritis. (R. at 243.) On July 19, 2004, Wilson received his second ESI, which he tolerated well without apparent complication. (R. at 242.) On this day, Dr. McLemore completed a Return to Work Status Report, in which he stated that Wilson could return to work on July 20, 2004, with the following restrictions: lifting limited to 21-50 pounds occasionally, 11-25 pounds frequently and 1-10 pounds constantly. (R. at 244.) Dr. McLemore also stated that Wilson could perform push and pull tasks using up to 55 pounds of push force and 42 pounds of pull force. (R. at 244.) Dr. McLemore classified Wilson as capable of a medium physical demand level. (R. at 244.)

On August 16, 2004, Wilson told Dr. McLemore that he had not improved since his last visit. (R. at 240.) Wilson also complained of a neurological event that occurred while eating on August 15, 2004, that involved shooting pains into his bilateral lower extremities. (R. at 240.) Dr. McLemore ordered an MRI of the lumbar spine, but noted no new objective findings. (R. at 240.)

On August 19, 2004, an MRI of the lumbar spine showed that Wilson had superimposed degenerative disc disease at every lumbar level and severe canal stenoses and disc protrusions throughout the spine. (R. at 159.) The MRI also showed superimposed developmental narrowing and significant foraminal narrowing at T10-11. (R. at 159.) On August 30, 2004, Wilson told Dr. McLemore that he had not improved, but noted that he had less pain in his back and leg. (R. at 236.) Dr. McLemore diagnosed Wilson with lumbar radiculitis, degenerative disease of the lumbar spine and spinal stenosis. (R. at 236.) Wilson

17

informed Dr. McLemore that his employer had been unable to accommodate his restricted work, hindering his ability to return to work. (R. at 236.) Dr. McLemore continued to recommend that Wilson pursue work that was less physically demanding. (R. at 236.)

On September 15, 2005, Wilson visited Dr. Jai Varandani, M.D., complaining of lower back pain, pain in the neck and legs, right shoulder pain, pain in both knees and hypertension. (R. at 255.) Upon physical examination, Dr. Varandani noted that Wilson was not in acute cardio pulmonary distress. (R. at 257.) With regard to his upper extremities, his strength was 5/5 and his deep tendon reflexes, ("DTR") were all normal. (R. at 257.) His sensation to touch was intact and his grip was normal. (R. at 257.) With regard to his lower extremities, DTR were bilaterally normal and sensation to touch was normal in all dermatones. (R. at 257.) Dr. Varandani found that there was no muscular wasting, no patellar or ankle clonus or pedel edema. (R. at 257.) Dr. Varandani found all joints to be unremarkable. (R. at 257.) In addition, there was no bony deformity, no sign of acute inflammation and the right knee was not inflamed or swollen. (R. at 257.) Dr. Varandani did note that Wilson had very mild tenderness at both right and left sacroililac joints. (R. at 257.) Among Dr. Varandani's clinical impressions, he noted chronic lower back pain with possible degenerative disease, chronic bursitis of right shoulder and uncontrolled hypertension. (R. at 257.)

On March 3, 2006, Wilson presented to Dr. Joel B. Ragland, M.D., for a neurological/neurosurgical evaluation. (R. at 272.) A review of Wilson's systems was negative for the following: constitutional, eye-ear-nose-throat, ("EENT"), cardiovascular, respiratory, hematologic, genitourinary, ("GU"), psychiatric,

endocrine and immunologic. (R. at 273.) A physical examination revealed that Wilson's strength was 5/5 and equal in all major muscle groups. (R. at 273.) It also revealed that his reflexes were 1+ but symmetric and his plantar responses were downgoing. (R. at 273.) Wilson's sensation had diminished to pinprick in the inner aspect of his right calf and the lateral aspect of his left calf. (R. at 273.) Upon examining Wilson's back, Dr. Ragland found some increased tone in his lumbar paraspinals, with very limited forward bending. (R. at 273.) An examination of Wilson's extremities revealed no atrophy or edema. (R. at 273.) He ambulated without evidence of a limp and was able to heel and toe walk without evidence weakness. (R. at 273.) Dr. Ragland then reviewed Wilson's MRI of the lumbar spine from August 19, 2004, which showed multilevel degenerative changes at the L3-4, L4-5 and L5-S1 levels. (R. at 274.) It also showed disc bulging at the L3-4 and L4-5 levels causing stenosis. (R. at 274.) Dr. Ragland recommended a cervical and lumbar myelogram and post myelographic CT scan with upright lumbar views and flexion and extension views of the lumbar spine. (R. at 274.) Dr. Ragland opined that Wilson was currently unable to work. (R. at 274.)

On March 9, 2006, Wilson had a CT scan of the cervical spine, performed by Dr. Glenn E. Jung, M.D., which revealed multilevel degenerative spondylosis and foraminal stenosis at several levels, however, there was no evidence of disc herniation or cord impingement at any of these levels. (R. at 268.) Wilson also had a CT scan of the lumbar spine which revealed L3-4 and L4-5 degenerative spondylosis with right sided disc herniations noted at both levels. (R. at 269) At both levels there was significant central canal stenosis, which was asymmetric to the right, as well as mild to moderate central canal stenosis at L2-3 and bilateral

19

foraminal stenosis at L5-S1. (R. at 269.)

On April 20, 2006, Wilson saw Dr. Ragland for a follow-up visit after his CT/myelogram. (R. at 270, 320.) Dr. Ragland diagnosed Wilson with lumbar stenosis most significant at L3-4 and L4-5 with right-sided disc herniations at these levels and a moderate stenosis at L2-3. (R. at 271, 321.) Wilson's cervical MRI demonstrated some degenerative osteophytes at various places, but no cord compression. (R. at 270, 320.) While Dr. Ragland believed that there was a greater than 60 percent chance that surgery would be of some benefit for him, Wilson was reluctant to consider it. (R. at 270, 320.) Dr. Ragland opined that he doubted that the surgery would allow him to go back and drive a coal truck in the future. (R. at 270, 320.) Dr. Ragland stated that he considered his current symptoms to be work-related because the onset of his back pain occurred following two work-related accidents, which eventually caused him to quit work. (R. at 270, 320.) It was left up to Wilson as to whether or not he wanted surgery, and if not, then Dr. Ragland would recommend some permanent restrictions at work. (R. at 271, 321.)

On September 21, 2006, Wilson returned to Dr. Ragland with a new diagnosis of diabetes. (R. at 322.) Dr. Ragland opined that this did not have anything to do with his symptoms. (R. at 322.) Wilson complained of numbness in his right leg and that both of his feet felt cold at times. (R. at 322.) Dr. Ragland explained to him that he had a 60 or 70 percent chance of benefiting from surgery. (R. at 322.) However, Wilson wanted to avoid surgery, and Dr. Ragland was somewhat reluctant to recommend it based on Wilson's young age. (R. at 322.) Dr. Ragland agreed with the July 15, 2004, FCE regarding Wilson's lifting

Case 2:07-cv-00068-GMW-PMS   Document 14   Filed 10/07/08   Page 20 of 38   Pageid#: 90

abilities. (R. at 322.) Dr. Ragland also opined that it was unrealistic for Wilson to consider going back to a job driving vehicles such as trucks on a routine basis, due to his back problems. (R. at 322.) In other words, he did not think it would be wise for the primary part of Wilson's job to be driving commercial vehicles, especially off paved roads. (R. at 322.)

On May 12, 2006, Dr. Thomas Phillips, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), finding that Wilson could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift items weighing up to 10 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in a typical eight-hour workday and push and/or pull without limitation. (R. at 299-303.) In assessing the credibility of the claimant's statements regarding symptoms and their effects on function, Dr. Phillips considered Wilson's medical history, the character of his symptoms, his activities of daily living, the type of treatment he received and the response to this treatment. (R. at 304.) Dr. Phillips noted that the record revealed that the treatment had generally been successful in controlling Wilson's symptoms. (R. at 304.) Dr. Phillips also noted that the medical records revealed that the Wilson's medications had been relatively effective in controlling his symptoms. (R. at 304.) In addition, there was no evidence that Wilson used any medication in order to treat symptoms associated with a mental impairment. (R. at 304.) After reviewing the opinion of the treating source, Dr. Ragland, with regard to Wilson's medical history, Dr. Phillips opined that Wilson's statements were only partially credible. (R. at 304-05.)

From November 1, 2003, through August 16, 2006, Wilson attended

21

Heartland Medical, P.C. for treatment. (R. at 276-98, 317-19.) During each of these visits, Wilson had a series of tests performed to evaluate his blood pressure, heart rate, cholesterol, temperature and other vital symptoms. (R. at 276-98, 317-19.) Wilson complained of lower back pain and hypertension for which he was prescribed various medications. (R. at 281.) On March 9, 2005, Wilson stated that he had been out of work for almost a year. (R. at 282.) On October 4, 2005, Heartland Medical determined that his heart was in normal sinus rhythm, his lungs were clear and that there was a lot of lower lumbar spasm and tenderness, particularly on the right side of his back. (R. at 281.) On July 12, 2006, Wilson presented to Heartland Medical with type II noninsulin-dependant diabetes mellitus. (R. at 319.) Wilson reported a family history of diabetes, and his blood sugars were routinely between 300-400. (R. at 319.) On July 21, 2006, and August 16, 2006, Wilson again presented to Heartland Medical for treatment of his diabetes. (R. at 317-18.) It was noted that his blood sugars were generally excellent and he had been on treatment for only one month. (R. at 317-18.)

On June 14, 2006, Robert. S. Spangler, Ed.D., performed a psychological evaluation on Wilson. (R. at 306-312.) Dr. Spangler noted that Wilson drove himself a distance of three miles to the evaluation, and that Wilson drove locally on a daily basis. (R. at 306.) Dr. Spangler noted during the evaluation that Wilson generally understood the instructions but demonstrated erratic concentration secondary to discomfort and anxiety. (R. at 306.) Dr. Spangler also noted that Wilson was not seeing a mental health professional. (R. at 307.) With regard to his mental status, it was noted that Wilson was alert and oriented. (R. at 308.) He had adequate recall of remote and recent events, and he was in discomfort, but had a good attitude. (R. at 308.) He knew the current President and named two recent

22

predecessors, and he was able to repeat three words after five minutes, and seven numbers presented serially forward and five backward. (R. at 308.) He knew the colors of the American flag and the shape of a ball. (R. at 308.) Dr. Spangler noted that Wilson appeared to be functioning in the high borderline to low average range of intelligence and was emotionally stable but mildly anxious. (R. at 308.) Wilson denied suicidal/homicidal ideations and hallucinations, and no delusional thought was evident. (R. at 308.) Dr. Spangler stated that Wilson was credible. (R. at 308.)

Examination of his activities of daily living revealed that, while his wife prepared all the meals, Wilson made his own sandwiches and sometimes helped with the laundry. (R. at 308.) Wilson reported that he shared grocery duties with his wife and he mowed the yard using a riding mower, fed his dog, and he watched television. (R. at 308.) Wilson described a good day as "[w]hen I visit at my father-in-law's store," and a bad day as "[w]hen I lay on the couch and cross my legs. It relieves the pain." (R. at 308.) With regard to his mental capability, Dr. Spangler noted that Wilson had the judgment necessary to handle his financial affairs if awarded benefits. (R. at 309.)

Psychological testing revealed a Verbal IQ of 83, a Performance IQ of 83 and a Full Scale IQ of 81. (R. at 309.) Wilson's reading achievement was at the seventh grade level with a standard score of 76, placing him in the fifth percentile. (R. at 309.) His arithmetic achievement was at fourth grade level with a standard score of 68, placing him in the second percentile. (R. at 309.) Wilson was diagnosed with anxiety disorder, not otherwise specified mild to moderate, low average intelligence, history of back injury and a Global Assessment of

23

Functioning, ("GAF"), score of 60-55.[5] (R. at 310.)

Dr. Spangler also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (R. at 313.) In assessing Wilson's occupational adjustments, Dr. Spangler found that Wilson had "good" ability make occupational adjustments in the categories of "Follow Work Rules," "Use Judgment the Public," "Interact with Supervisors," and "Function Independently"; "good/fair" ability to make occupational adjustments in the categories of "Relate to Co-Workers" and "Maintain Attention/Concentration"; and "fair" ability to make occupational adjustments in the categories of "Deal with Public" and "Deal with Work Stresses." (R. at 313.)

In assessing Wilson's performance adjustments, Dr. Spangler found that Wilson had "good" ability to understand, remember and carry out "Simple job instructions"; "fair" ability to understand, remember and carry out "Detailed, but not complex, job instructions"; and "poor/none" ability to understand, remember and carry out "Complex job instructions." (R. at 314.)

In assessing Wilson's personal and social adjustments, Dr. Spangler found that Wilson had "good/fair" ability to adjust personally and specially in the categories of "Maintain Personal Appearance," "Behave in an emotionally stable manner," and "Relate predictable in social situations"; and "poor/none" ability to adjust personally and specially in the category of "Demonstrate reliability." (R. at

---

[5] A GAF of 60-55 indicates that the individual has some "moderate symptoms," or is experiencing "moderate difficulty in social, occupational, or school functioning." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994)."

314.)

Dr. Spangler also found that Wilson had "poor/none" ability to understand, remember, and carry out complex instructions, fair ability to understand, remember, and carry out detailed, but not complex job instructions, and good ability to understand, remember and carry out simple job instructions. (R. at 314.) Dr. Spangler also found that Wilson had good to fair ability to maintain person appearance, behave in an emotionally stable manner, and relate predictable in social situations. (R. at 314.) In addition, he found Wilson to have "poor/none" ability to demonstrate reliability. (R. at 314.) In finding any limitations, Dr. Spangler opined that Wilson had anxiety disorder, not otherwise specified mild to moderate, erratic concentration, and chronic fatigue. (R. at 314.) Dr. Spangler further opined that Wilson can manage benefits in his own best interests, and that he should anticipate his impairment to cause him to miss work more than two days a month. (R. at 315.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. § 404.1520 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point

25

in the process, review does not proceed to the next step. *See* C.F.R. § 404.1520(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 14, 2006, the ALJ denied Wilson's claim. (R. at 13-24.) The ALJ found that Wilson met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 18.) The ALJ determined that Wilson had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ also found that Wilson suffered from degenerative lumbar disc disease with disc bulging and stenosis, with low back and bilateral lower extremity pain, chronic bursitis of the right shoulder with a history of a right rotator cuff tear, obesity, and anxiety. (R. at 18.) The ALJ found that these impairments were "severe" based upon the requirements listed in 20 C.F.R. § 404.1520(c). (R. at 18.) However, the ALJ determined that Wilson did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P,

26

Appendix 1. (R. at 19.)  The ALJ also found that Wilson possessed the residual functional capacity to perform a limited range of light work that allowed the claimant to lift or carry items weighing up to 10 pounds frequently and items up to 20 pounds occasionally, but prohibited overhead lifting with the right arm. (R. at 21).  The ALJ found that the claimant was able to sit, stand or walk about six hours each in a typical eight hour workday, with no environmental, communicative or visual limitations.  In addition, the ALJ found that the claimant could occasionally keel, bend, stoop, crouch and crawl, but that he could never climb. (R. at 21.)  Due to a moderate reduction in concentration, the ALJ found that the claimant was limited to simple, non-complex tasks. (R. at 21.)  Thus, the ALJ determined that Wilson was unable to perform any of his past relevant work as a truck driver. (R. at 22.)  Based upon Wilson's age, education, past work experience and the testimony of a vocational expert, the ALJ concluded that Wilson could perform jobs existing in significant numbers in the regional and national economies, including those of a parking lot attendant, airline security guard and ticket taker. (R. at 23.)  Therefore, the ALJ found that Wilson was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at 24.)  *See* 20 C.F.R. § 404.1520(g).

Wilson argues that the ALJ erred by improperly determining Wilson's residual functional capacity, ("RFC"), (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Specifically, Wilson argues that the ALJ's determination of his RFC is not supported by substantial evidence of record. (Plaintiff's Brief at 6-9.)  Second, Wilson argues that the ALJ erred by failing to give full consideration to the findings of Dr. Spangler as to the severity of Wilson's mental impairments and the resulting affects on Wilson's work ability.

27

(Plaintiff's Brief at 9-10.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Wilson's first argument is that substantial evidence does not support the ALJ's finding as to his residual functional capacity. (Plaintiff's Brief at 6.) In the

ALJ's decision, he determined that Wilson was capable of performing a limited range of light work. (R. at 21.) The ALJ found that Wilson could lift or carry items weighing up to 10 pounds frequently and items weighing up to 20 pounds occasionally, but that he could not perform overhead lifting with the right arm. (R. at 21.) Further, the ALJ found that Wilson retained the ability to sit, stand or walk about six hours each in a typical eight-hour work day, with the option to alternate positions as desired. (R. at 21.) In addition, the ALJ determined that Wilson could perform occasional kneeling, bending, stopping, crouching and crawling, but that he could never perform climbing. (R. at 21.) Due to a moderate reduction in concentration, Wilson was limited to simple, non-complex tasks. (R. at 21.) Wilson argues that, based on his severe back pain and anxiety, along with resulting limitations, he is unable to perform substantial gainful activity at any level of exertion and is totally disabled. (Plaintiff's Brief at 9.) This argument is without merit.

Light work is work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Furthermore, a job is considered light work when it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In the ALJ's opinion, he determined that Wilson was capable of performing a limited range of light work. In reaching this conclusion, the ALJ considered the opinions of the treating, examining and reviewing physicians, each of whom made findings that Wilson experienced lower back pain among other things, but did not find any functional limitations that would preclude him from performing substantial gainful activity. (R. at 18-22.)

29

The ALJ first considered the opinion of a treating orthopedist, Dr. McLemore. On January 5, 2004, Dr. McLemore diagnosed Wilson with lumbosacral strain with discogenic lower back pain and lumbar radiculitis. (R. at 254.) Dr. McLemore ordered Wilson to return to his regular job and requested a follow-up in one month. (R. at 254.) On April 27, 2004, Wilson reported a tingling and numbness in his left foot. (R. at 248.) Dr. McLemore noted that Wilson was unable to return to work at his regular job and that he would have to work without lifting or frequent stopping or bending, and that the bouncing of his truck disturbed his back. (R. at 248.)

On July 19, 2004, Dr. McLemore stated that Wilson could return to work the next day with the following restrictions: lifting limited to 21-50 pounds occasionally, 11-25 pounds frequently and 1-10 pounds constantly. (R. at 244.) Dr. McLemore also stated that Wilson could perform push and pull tasks using up to 55 pounds of push force and 42 pounds of pull force. (R. at 244.) Dr. McLemore classified Wilson as capable of a medium physical demand level. (R. at 244.)

On August 16, 2004, Wilson told Dr. McLemore that he had not improved since his last visit. (R. at 240.) Dr. McLemore ordered an MRI of the lumbar spine, but noted no new objective findings. (R. at 240.) On August 19, 2004, an MRI of the lumbar spine showed that Wilson had superimposed degenerative disc disease at every lumbar level and severe canal stenoses and disc protrusions throughout the spine. (R. at 159.) Dr. McLemore diagnosed Wilson with lumbar radiculitis, degenerative disease of the lumbar spine and spinal stenosis. (R. at

30

236.) Dr. McLemore continued to recommend that Wilson pursue work that was less physically demanding. (R. at 236.)

The ALJ next considered the findings of Dr. Varandani. On September 15, 2005, Wilson visited Dr. Varandani complaining of lower back pain, pain in the neck and legs, right shoulder pain, pain in both knees and hypertension. (R. at 255.) Upon physical examination, Dr. Varandani noted that Wilson's strength and DTRs were all normal, (R. at 257), both his sensation to touch and his grip were normal, (R. at 257), and with regard to his lower extremities, his DTRS were bilaterally normal and his sensation to touch was normal. (R. at 257.) Dr. Varandani did note that Wilson had very mild tenderness at both right and left sacroililac joint. (R. at 257.) Among Dr. Varandani's clinical impressions, he noted chronic lower back pain with possible degenerative disease, chronic bursitis of right shoulder, and uncontrolled hypertension. (R. at 257.)

The ALJ also considered physical therapy sessions that Wilson attended at Claiborne County Hospital from April 2004 to August 2004. (R. at 160-235.) Despite his lingering ailments, Wilson's condition improved with each treatment. The Fourth Circuit has determined that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

On April 30, 2004, Wilson noted that the numbness in his lower extremities had improved and that he was able to mow his yard without any significant increase in lower back pain. (R. at 215.) During his May 5, 2004, visit, Wilson denied complaints of pain, soreness or stiffness, but stated that he still had some

31

numbness on the lateral side his left foot, but that it seemed to be improving. (R. at 214.) On May 10, 2004, Wilson's physical therapist provided a status report after eight visits, which noted that his pain had decreased to 0/10, and his numbness had improved in the lateral foot although some pain continued. (R. at 213.) On May 12, 2004, Wilson reported having "minimal discomfort" after having to change a flat tire. (R. at 208.) On May 21, 2004, Wilson reported that he felt much better after his last treatment and that he did not have any pain for the rest of the day. (R. at 204.) On May 28, 2004, Wilson's therapist wrote up another status report, noting that overall Wilson had made great progress, with no complaints of radiating pain into either lower extremity. (R. at 201.) In a status report dated July 16, 2004, Wilson's physical therapist noted that he was experiencing 5/10 lower back pain and right hip pain, with occasional right lower extremity symptoms, such as numbness. (R. at 174.) The therapist noted that overall Wilson's strength had remained consistent in his lower back, and that he had improved his endurance, but was still limited. (R. at 174.) On July 23, 2004, Wilson complained of a "little" ache that morning while mowing using the tractor. (R. at 172.) On August 9, 2004, Wilson reported that he was pain free and tolerated his treatment well. (R. at 166.) On August 10, 2004, Wilson's therapist reported that he tolerated the treadmill with moderate fatigue. (R. at 164.)

The ALJ also considered an FCE administered by Andrew Smith on July 14, 2004, in which Smith concluded that that Wilson's demonstrated abilities met specific job demands in many categories, (R. at 151), and that despite Wilson's subjective pain complaints, he exhibited no functional limitations. (R. at 152.) Andrews noted that the results indicated that Wilson's present Physical Demand Characteristic level of work was medium. (R. at 151.)

32

The ALJ also considered a physical examination performed by Dr. Ragland on April 20, 2006. (R. at 270, 320.) Dr. Ragland diagnosed Wilson with lumbar stenosis most significant at L3-4 and L4-5 with right-sided disk herniations at these levels and a moderate stenosis at L2-3. (R. at 270, 320.) While Dr. Ragland believed that there was a greater than 60 percent chance that surgery would be of some benefit for him, Wilson was nonetheless reluctant to consider it. (R. at 270, 320.) Dr. Ragland opined that he doubted that the surgery would allow him to go back and drive a coal truck in the future. (R. at 270, 320.)

After considering Dr. Ragland's opinion, the ALJ rejected it, stating that it was inconsistent with the other evidence of record. (R. at 22.) While it is customary to give controlling weight to a treating physician, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[6] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

While Dr. Ragland classified Wilson as "currently unable to work," (R. at

---

[6] *Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

33

274), this classification only applied to his past relevant work as a truck driver. (R. at 270.) Dr. Ragland did not express an opinion as to whether Wilson could perform any other type of work, (R. at 270), but rather stated that if Wilson did not undergo surgery, he would recommend some permanent restrictions at work. (R. at 271, 321.) Dr. Ragland also ratified the results of the FCE administered to Wilson in July 2006. In a treatment note, dated September 21, 2006, Dr. Ragland stated that "from a long-term restriction standpoint I would consider his FCE from July 15, 2004, to be appropriate as far as lifting abilities go. However, I think it is unrealistic for his back like it is to consider going back to a job driving vehicles such as dump trucks on a routine basis." (R. at 322.) Dr. Ragland further stated, "I do not think it would be wise for the primary part of his job to be driving commercial vehicles, especially off paved roads." (R. at 322.) While it is evident that Dr. Ragland opined that Wilson would no longer be able to drive trucks, he failed to express an opinion with regard to Wilson's ability to perform any substantial gainful activity.

The ALJ gave great weight to the opinion of Dr. Phillips, a state agency physician who assessed Wilson's residual functional capacity, because it was consistent with other objective evidence of record. (R. at 22, 299-303.) With regard to the testimony of a non-treating physician, the Fourth Circuit Court of Appeals indicated that such testimony should be discounted and does not constitute substantial evidence when it is totally contradicted by other evidence in the record. *Martin v. Secretary*, 492 F.2d 905, 908 (4th Cir. 1974). However, the court ruled in *Kyle v. Cohen*, 449 F.2d 489 (4th Cir. 1971), that the testimony of a non-examining, non-treating physician can be used and relied upon if it is consistent with the record. Finally, "if the medical expert testimony from examining or

34

treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds himself should stand." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

Dr. Phillips opined that Wilson could occasionally lift and/or carry items weighing up to 20 pounds, occasionally lift items weighing up to 10 pounds, stand and/or walk for a total of about six hours in a typical eight-hour workday, sit for a total of about six hours in a typical eight-hour workday and push and/or pull without limitation. (R. at 300.) Dr. Phillips noted that the record revealed that the treatment had generally been successful in controlling Wilson's symptoms. (R. at 304.) Dr. Phillips also noted that the medical records revealed that the Wilson's medications had been relatively effective in controlling his symptoms. (R. at 304.) In addition, there was no evidence that Wilson used any medication in order to treat symptoms associated with a mental impairment. (R. at 304.) After reviewing the opinion of the treating source, Dr. Ragland, with regard to Wilson's medical history, Dr. Phillips opined that Wilson's statements were partially credible. (R. at 304-05.) Therefore, because the opinion of Dr. Phillip's was consistent with other objective evidence of record, the ALJ was justified in according significant weight to his findings.

In addition to the findings of treating and non-treating sources, the ALJ examined other objective evidence in reaching his conclusion. Wilson had never undergone any surgery, nor had he ever been prescribed prescription drugs for his lower back pain. (R. at 22.) Rather, he had received physical therapy treatment and taken over-the-counter medications. (R. at 22, 334.) Throughout his physical therapy, Wilson had been able to perform many daily activities, such as mow his

35

lawn, change a flat tire and go grocery shopping. (R. at 338, 205, 308) Wilson also testified that he often went to his in-laws store in the front of his house where he would "stand around" and "sit around." (R. at 339.) When asked if he ever worked at the store as a cashier, Wilson stated that he had "never been interested in doing it." (R. at 339.) Wilson also stated that he had not looked for any kind of employment other than that of a truck driver because he was worried it would affect his workers' compensation benefits. (R. at 340.)

Despite the opinions of several treating sources, namely Dr. McLemore's opinion that Wilson was capable of a medium physical demand level, (R. at 244), the FCE which indicated that Wilson's present Physical Demand Characteristic level of work was at medium, (R. at 151), and Dr. Ragland's ratification of the FCE results, (R. at 322), the ALJ still gave Wilson the benefit of the doubt in finding his RFC to be that of a limited range of light work. (R. at 23.) As a result, this court finds that there was substantial evidence to support the ALJ's decision in finding Wilson to have the RFC to perform a limited range of light work. (R. at 23.)

Wilson also argues that the ALJ erred by failing to give full consideration to the findings of Dr. Spangler as to the severity of Wilson's mental impairments and the resulting affects on Wilson's work ability. (Plaintiff's Brief at 9-10.) As shown in the record, Dr. Spangler performed a psychological evaluation on Wilson on June 14, 2006. (R. at 306-312.) In determining Wilson's RFC, the ALJ factored in Wilson's anxiety, which he classified as "severe." (R. at 18.) In this case, the ALJ considered the conclusion of Dr. Spangler that Wilson had a poor ability to demonstrate reliability and rejected it as being inconsistent with Wilson's work

36

history, his activities of daily living and his demeanor at the hearing. (R. at 22.)

The ALJ was not required to give controlling weight to Dr. Spangler's opinion. As stated earlier, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. In this case, the ALJ found Dr. Spangler's opinion to be inconsistent with other objective evidence of record. (R. at 22.) The ALJ noted that Wilson had no history of mental health treatment, no psychiatric hospitalizations and no documentation of any episodes of decompensation. (R. at 22.) In addition, none of the other treating physicians noted any mental impairments, including Dr. Ragland, who stated that Wilson's history for psychiatric impairments was negative. (R. at 273.) The ALJ also found that, although Wilson reported increased anxiety, he was neither seeking mental health treatment nor taking any medications for a mental impairment. (R. at 342.)

In completing a Medical Assessment of Ability to Do Work-Related Activities, Dr. Spangler found Wilson to have "poor/none" ability to demonstrate reliability. (R. at 314.) Dr. Spangler further opined that Wilson could manage benefits in his own best interests, and that he should anticipate his impairment to cause him to miss work more than two days a month. (R. at 315.) The ALJ rejected the notion that Wilson was not reliable, stating that there was no objective evidence of record to support this. (R. at 21.) There was no evidence that Wilson consistently missed work while working as a truck driver. In addition, Wilson attended numerous physical therapy sessions, and there was no evidence to suggest he was unreliable in his attendance. (R. at 160-235.)

37

Despite the lack of evidence of a mental impairment, the ALJ once again gave Wilson the benefit of the doubt in finding that his anxiety was "severe." (R. at 18.) The ALJ therefore did place some weight on Dr. Spangler's finding that Wilson was credible, (R. at 308), and Dr. Spangler's subsequent diagnoses of anxiety disorder, not otherwise specified mild to moderate, low average intelligence, history of back injury, and a GAF of 60-55. (R. at 310.) In factoring in Dr. Spangler's observation that Wilson demonstrated erratic concentration, the ALJ also limited Wilson to the performance of simple, non-complex tasks. (R. at 21.) As a result, this court finds that there was substantial evidence to support the ALJ's findings as to Wilson's mental capabilities.

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Wilson's motion for summary judgment.

An appropriate order will be entered.

**ENTER:** This ___7th___ day of October, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

38